UNITED STATES DISTRICT COURT

Central District of California

FILED

CLERK, U.S. DISTRICT COURT

7/17/2026

CENTRAL DISTRICT OF CALIFORNIA

BY_____jji_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

_____
                                          )
APRIL CHANDLER                            )
                          Plaintiff       )
                                          )
                                          )
          -against-                       )
                                          )
                                          )
MARK SKIPPER AKA SKIP ARCHIMEDES,         )
MICHAEL MALOY, EMPIRICAL MEDIA LLC.       )
                                          )
                                          )
                      Defendants          )
_____  )

Case No.: 2:25-cv-08210-MWC-PVC

Hon. Michelle Williams Court

## STATEMENT OF UNCONTROVERTED FACTS

(C.D. Cal. Local Rule 56-1)

Pursuant to C.D. Cal. Local Rule 56-1, Plaintiff submits the following Statement of Uncontroverted Facts in chronological order. Each fact is supported by an exhibit, a docket citation, or Defendant's own sworn statement or filing. No genuine dispute of material fact exists as to any of the following:

## A. PLAINTIFF'S OWNERSHIP AND CHAIN OF TITLE

1. Plaintiff is an independent filmmaker with over 23 years of experience who created, directed, produced, and narrated the documentary film Quest for Youth (formerly Fountain of Youth) (the "Film"), consisting of at minimum 90% of her own raw footage. TAC paragraphs 1-4, 34; Chandler Decl. paragraphs 1, 6.

1

2. The Film is derived from Plaintiff's predecessor production, "Fountain of Youth I." Chandler Decl. paragraph 3; Exhibit D, p.19.

3. Plaintiff holds U.S. Copyright Registration No. PAU004219986 for Quest for Youth. Chandler Decl. paragraph 2; Exhibit D, p.2.

4. Producer Fraser Bailey formally assigned all rights in the footage to Plaintiff via a Quitclaim Agreement, retaining a 15% producer fee from sales remuneration. Chandler Decl. paragraph 2; Exhibit D, pp.7-9.

5. A WhatsApp thread shows Bailey reviewing the Quitclaim Agreement, confirming "All looks fair," negotiating a minor addition, and executing the agreement. Chandler Decl. paragraph 2; Exhibit D, p.10.

6. Every expert cast member executed a video release stating that the recordings remain the property of Plaintiff and the Production Company, and that nothing in the releases grants Defendant an independent ownership interest or right to commercially exploit the footage. A representative sample of these releases is attached as Exhibit D, pp.11-16; the complete set was shared with Thomas Harrison on December 15, 2023. Chandler Decl. paragraph 4; Exhibit A, pp.39-40; Exhibit D, pp.11-16.

7. Plaintiff personally controlled distribution of the executed video releases, instructing Thomas Harrison in writing not to share these releases, or the cast contact information contained on some of them, with Defendant. Chandler Decl. paragraph 4; Exhibit A, pp.39-40.

8. The Quitclaim Agreement includes Bailey's express warranty that there were no undisclosed contracts or encumbrances on the rights he assigned. Exhibit D, pp.7-9.

9. Bailey and Play TV are the first link in this chain of title, not an intermediate one. Exhibit D, pp.7-9.

10. Defendant has not identified any other person or entity with a predecessor claim to the underlying footage, and none exists in this record.

11. Plaintiff registered her copyright on February 8, 2024, which this Court has twice judicially noticed. Chandler Decl. paragraph 2; Dkt. #262 at 4; Dkt. #321 at 12.

12. Defendant's own declaration confirms Plaintiff sent him an existing rough cut for revision, not a blank slate: she had "a documentary film she claimed to have produced" and sent him "a link to a rough cut." Dkt. #198 paragraph 6 (Exhibit E).

13. This Court has already confirmed that the statutory presumption of validity applies to Plaintiff's registration and placed the burden on Defendant to rebut it. Dkt. #321 at 12.

14. Addressing Defendant's attack on originality, the Court found that his argument "fails on the first prong" because he "proffered no evidence that Plaintiff had access" to the pre-existing footage he identified, and concluded that Defendant "failed to carry his burden to demonstrate a lack of originality." Dkt. #321 at 13.

## B. THE WORK-MADE-FOR-HIRE AGREEMENT

15. Before any written agreement existed, Defendant's own contemporaneous communications described his role as revising Plaintiff's existing footage, not creating a new work. Exhibit E, pp.20-21.

16. On January 5, 2023, the parties executed a Work-Made-for-Hire Agreement designating Defendant as "Contractor/Editor" and Plaintiff as "Recipient," vesting all rights, including copyright, exclusively in Plaintiff. Dkt. #122 at 44-45 (Exhibit D); Chandler Decl. paragraph 5.

17. This Court has already held that the Work-Made-for-Hire Agreement provides that the copyright lies ab initio with Plaintiff. Dkt. #321 at 13.

18. Defendant's own January 2023 draft agreement itself repeatedly refers to the project as an "existing documentary film," acknowledging that the documentary and the production already existed before Defendant's engagement. Dkt. #122 at 44-45 (Exhibit D).

19. Defendant has separately sworn that a different document, his own "Letter of Agreement," is instead "the only signed written agreement" between the parties, but that document contains no

3

clause transferring any ownership interest to Defendant. Dkt. #54-1 paragraph 13; Dkt. #26 at Ex. 1 (Exhibit E).

20. In the same declaration, Defendant suggested his signature on the Work-Made-for-Hire Agreement was forged. Chandler Decl. paragraph 7.

21. Plaintiff attests that the Work-Made-for-Hire Agreement is the genuine document Defendant countersigned as part of the parties' January 2023 engagement. Chandler Decl. paragraph 7.

22. In the same declaration in which he suggested forgery, Defendant separately admitted that he "thoroughly reviewed" his email history "to ensure [his] memory was correct" — conduct inconsistent with a genuine belief in forgery. Dkt. #54-1, p.3, paragraphs 10-14 (Exhibit E).

23. Plaintiff's Apple Pay records show five payments totaling $12,500 to Defendant, consistent with contractor compensation. Chandler Decl. paragraph 8; Exhibit C.

## C. PERFORMANCE — DEFENDANT ACTED AS EDITOR UNDER PLAINTIFF'S DIRECTION

24. Plaintiff shipped the MEDIA DRIVES to Defendant in August 2023; he confirmed receipt and that "everything seems to be there" — a statement only coherent because he already knew, from the Fountain of Youth cut she had sent him months earlier, what the Film was supposed to contain. Chandler Decl. paragraphs 10, 11, 12; Exhibit A, p.17.

25. Defendant acknowledged the drives were hers ("I can get your drives back to you"), never returned them, and provided a project update and budget renegotiation on August 27, 2023. Chandler Decl. paragraphs 13, 14; Exhibit A, pp.18-23.

26. Defendant later confirmed under oath that the only version of the Film he ever distributed was a password-protected review copy, "meant solely for review purposes." Chandler Decl. paragraph 15; Dkt. #198 paragraphs 15, 18 (Exhibit E).

## D. TERMINATION — 'SEVER ALL TIES' AND BREACH

4

27. On December 15, 2023, in the same letter in which Defendant sought to "sever all ties with April Chandler and the documentary project" and requested his name removed from "all promotional materials," Defendant simultaneously accused Plaintiff of having "induced Maloy to underbid his services." Dkt. #303 at 49 (Exhibit E).

28. Defendant delivered a first cut only as a locked, password-protected review copy — never in editable format, and never a final cut. Chandler Decl. paragraph 15.

29. In the following weeks, Defendant's own communications with Bailey — asking whether Plaintiff was present at the shoots and describing his own role as merely "approached to complete" the Film — were met with Bailey's direct confirmation to Defendant that "April Chandler owns the film. Definitely not Skip." Chandler Decl. paragraph 32; Exhibit B, pp.22-23, 25.

30. Days later, on January 14, 2024, Defendant filed a competing copyright registration. TAC paragraphs 21, 86; Chandler Decl. paragraph 42; Exhibit E, p.2.

31. Defendant himself submitted a communication to Big Media asserting: 'I am the author of the film and hold substantial rights.' Exhibit B, pp.18-19.

32. Plaintiff sent a cease-and-desist on January 17, 2024, prompted by Defendant's communication to Big Media, not by any knowledge of the registration, which she did not discover until February 8, 2024. Chandler Decl. paragraph 38.

33. Nearly three years later, the drives remain unreturned. Chandler Decl. paragraph 35.

**E. FILM CREDITS AND THE EXHIBIT F COMPARISON**

34. Plaintiff has prepared, and attaches as Exhibit F, a side-by-side, element-by-element comparison of her predecessor cut ("Fountain of Youth") and the cut Defendant edited as the commissioned Editor ("Quest for Youth"), identifying the specific interview subjects, b-roll, and footage common to both works. Chandler Decl. paragraphs 16, 20; Exhibit F, pp.2-13.

35. Exhibit F shows an identical film poster (differing only in that the Quest For Youth cut, not yet in Final Cut form, lacks the cast card), an identical film structure, and corresponding cast interview segments common to both cuts. Exhibit F, pp.2-13.

36. Exhibit F shows that the Quest For Youth cut changed Plaintiff's on-screen credit from "Executive Producer" — the credit on Plaintiff's own predecessor cut — to "A Film By April Chandler." Exhibit F, pp.2-13; Exhibit D, pp.17-18.

37. Defendant, who edited the Quest For Youth cut, is not crediting himself as director anywhere in the First Cut or Trailer, nor is he presenting his company Empirical Media LLC as the production company. Chandler Decl. paragraph 19; Exhibit D, pp.17-18, 32-34.

38. In that same First Cut, Defendant added himself to multiple other credited roles — without discussing the change with Plaintiff, the Film's Producer and Director. Chandler Decl. paragraph 18; Exhibit D, pp.17-18.

## F. PLAINTIFF'S CHAIN OF TITLE IS COMPLETE; DEFENDANT HAS IDENTIFIED NO OWNERSHIP DOCUMENT

39. Despite three dispositive motions, two sworn declarations, counterclaims expressly asserting ownership, and the opportunity for discovery, Defendant has not identified a single document satisfying 17 U.S.C. Section 204(a) by which Plaintiff transferred copyright ownership to him.

40. The documentary evidence supporting Plaintiff's ownership includes: a federal copyright registration (Exhibit D, p.2); a signed Work-Made-for-Hire Agreement (Exhibit D, p.3); a Quitclaim from producer Bailey (Exhibit D, p.7); expert cast video releases (Exhibit D, pp.11-16); a distribution agreement in Plaintiff's own name with Big Media, in which she warranted that she had acquired all rights in the Program (Exhibit D, pp.26-31); and Defendant's own admissions, repeated across five separate filings over more than two years, that he was commissioned.

41. Defendant has told a federal court under oath that a different document — a "Letter of Agreement" he drafted — is "the only signed written agreement" governing the parties' relationship, yet that document addresses fee, payment schedule, choice of law, and arbitration, but nowhere purports to transfer, reserve, or vest any copyright interest in Defendant. Dkt. #54-1 paragraph 13 (Exhibit E).

42. Plaintiff drew the distinction between a fee dispute and a chain-of-title dispute contemporaneously, before this litigation existed, writing to Harrison: "the deal was changed and a dispute over money is nothing to do with chain of title — he would have to sue me, he can't just email people saying it's his project and not mine." Exhibit B, p.13.

43. This history is consistent with, and corroborated by, the Quitclaim Agreement and the WhatsApp thread finalizing it. Exhibit D, p.10.

## G. DEFENDANT'S OWN SWORN STATEMENTS ESTABLISH CONTRACTOR STATUS

44. Defendant swore, in a declaration filed in the Northern District of New York: "I have never claimed to own the raw materials... that I use to create my works." Dkt. #54-1 paragraph 3.

45. In the same declaration, Defendant swore: "My clients seek me out for my creative skill and original thought... it is still my creativity they are commissioning" — his own description of Plaintiff as his "client." Dkt. #54-1 paragraph 3 (emphasis added).

46. Defendant swore, in a declaration filed in this Court, that Plaintiff asked him "to fix a documentary film she claimed to have produced" and "sent me a link to a rough cut." Dkt. #198 paragraph 6.

47. Defendant swore that the Vimeo version he distributed was "meant solely for review purposes" with time-code because that "allows a client to provide specific notes" — again using the word "client" to describe Plaintiff. Dkt. #198 paragraphs 15, 18.

48. Defendant swore that on January 5, 2023, he sent Plaintiff "a draft letter of agreement to formalize the contract between us." Dkt. #54-1 paragraphs 8-9.

49. Defendant swore that on January 23, 2023, "Ms. Chandler sent back a signed copy of the letter and I countersigned the same." Dkt. #54-1 paragraphs 8-9.

50. In his own Motion for Summary Judgment brief filed in this Court, Defendant stated: "This action arises out of a contractual relationship between the Plaintiff and Defendant, under which Plaintiff commissioned Defendant to create an original artistic work for her benefit derived in part from component materials used in a pre-existing film." Dkt. #301 at 13-14.

51. In that same brief, Defendant recited discovery responses stating "Plaintiff commissioned Defendant to create the film" and that "Plaintiff did not personally film the footage." Dkt. #301 at 13-14.

52. This Court held that these statements "only serve to undermine Defendant's own arguments." Dkt. #321 at 17.

53. Defendant is saved in Plaintiff's phone as "Michael Maloy — Editor." Five payments of $2,500, totaling $12,500, from Plaintiff to Defendant are consistent only with a contractor relationship. Exhibit C.

54. In October 2023 texts, Defendant wrote to Plaintiff: "your voice sounds awesome in the cut. I have some mixing to do..." — his own confirmation that the Film's narration is Plaintiff's voice, with his role limited to the technical work of mixing it into the cut. Exhibit A, pp.27-29.

55. Co-Defendant Mark Skipper, in a submission to Big Media, described Defendant's role as having "created the edit for Quest For Youth." Exhibit B, pp.8-9.

56. This Court's own order quotes this statement and found it sufficient, together with related evidence, to conclude that "Plaintiff has therefore produced evidence to show copying of the Film." Dkt. #321 at 16.

## H. DEFENDANT'S COUNSEL'S REPRESENTATIONS REFLECT THE SAME CHARACTERIZATION

57. Defendant's own retained counsel, in the Northern District of New York, recited that Plaintiff alleged Defendant "was introduced to [Plaintiff] and film project Fountain of Youth as a 'work made for hire' editor," without disputing that characterization of the parties' relationship. Dkt. #103-1 at 4.

58. In the same proceeding, Defendant's retained counsel separately argued that Plaintiff "provides Mr. Maloy with raw footage with which to create a film." Dkt. #103-1 at 4-5.

59. Defendant's own venue brief in this Court argued that Plaintiff "reached out to Mr. Maloy, a California resident, and commissioned his services to be performed in California." Dkt. #127.

60. These representations are admissions by a party under Fed. R. Evid. 801(d)(2).

## I. DEFENDANT'S OWN MOTION PAPERS ADMIT COMMISSIONED STATUS

61. In his Motion to Dismiss the TAC in this Court, Defendant titled his own argument "Plaintiff Admits the Work Was Authorized and Commissioned," conceding that the operative complaint alleges "Plaintiff requested and commissioned the work," "Plaintiff provided the original film materials," and that "the new work was created for her benefit." Dkt. #233.

62. Defendant contends in this court that Quest for Youth is an entirely new and independent film, while his own prior sworn statements and filings in the Northern District of New York acknowledge that Plaintiff supplied an existing documentary that served as the basis for his editing work. Dkt. #198 paragraph 6; Dkt. #122 at 44-45 (Exhibit D).

## J. THE COMMISSIONED-WORK DOCTRINE INDEPENDENTLY SUPPORTS PLAINTIFF'S OWNERSHIP

63. The documentary evidence reflects that Plaintiff commissioned the work, provided the source footage, paid contractor fees, voiced the narration, and held the distribution agreement. See supra Sections A-C, G.

64. This Court has already applied the Twentieth Century Fox presumption that a work "produced at the instance and expense of another party" is presumed a work for hire whose copyright "lies ab initio" with the commissioning party. Dkt. #321 at 12, 17.

## K. DEFENDANT HAS PRODUCED NO DOCUMENTARY EVIDENCE SUPPORTING OWNERSHIP

65. Defendant has litigated this action through multiple dispositive motions and the completion of fact discovery. Despite having every opportunity to do so, Defendant has not identified any written copyright assignment or transfer satisfying 17 U.S.C. Section 204(a), any chain-of-title document, or any documentary evidence demonstrating acquisition of any exclusive right comprised in the copyright.

66. Following the close of fact discovery, Defendant still has not identified a single document, witness, or specific fact supporting his claimed ownership interest, instead declining to respond to interrogatories and requests for production directed to that issue on a timeliness objection. Exhibit I.

67. Defendant's responses to Plaintiff's Requests for Admission, addressed in the Declaration of April Chandler at paragraph 56 and attached as Exhibit I, are subject to the Court's independent review under Fed. R. Civ. P. 36(a)(3) and (a)(4).

68. The record shows Defendant himself proposed and negotiated the change in budget terms, in writing, well before any ownership dispute existed. Exhibit A, pp.20-23.

69. Defendant did not assert any ownership interest in the Film until after his own December 15, 2023 letter — sent in the same period he began coordinating with Skipper regarding an alternate version of the Film. Chandler Decl. paragraphs 23-32, 40; Exhibit E, p.3.

## L. HARRISON'S CONTEMPORANEOUS COMMUNICATIONS ARE INCONSISTENT WITH HIS LATER DECLARATION

70. During January 2024, while distribution negotiations were ongoing, Harrison communicated directly with Plaintiff concerning distribution strategy, territorial rights, negotiations with Defendant, and completion of the Film. Exhibit A, pp.37-43.

71. At no point during these contemporaneous communications did Harrison question Plaintiff's ownership, chain of title, or authority to negotiate distribution; instead, Harrison confirmed that Defendant was "agreeing to what we want," described Defendant's compensation as "his fees," and discussed returning Plaintiff's MEDIA DRIVES. Exhibit A, pp.37-43.

72. More than two years later, after litigation commenced, Harrison submitted a declaration in support of Defendant's Motion for Summary Judgment stating that when he asked Plaintiff for documentation supporting her ownership, she responded with "a quitclaim and a set of appearance releases that did not establish clear ownership of the underlying footage." Harrison Decl. paragraph 14 (Dkt. #303 at 33-35; Exhibit E, pp.23-25).

73. Harrison represented both Defendant and Vanguard's broader interests throughout the underlying dispute, giving him his own reason to support Defendant's position once litigation began, given Vanguard's own potential exposure for its role in the events described in this record. Harrison Decl. paragraphs 7-8, 12, 16.

74. Plaintiff's ongoing, direct working relationship with the Film's cast — reflected in podcast interviews she conducted with cast members on September 28, 2023 and December 10, 2023 — is further consistent with her role as the Film's producer, independent of Defendant's editing engagement. Exhibit D, pp.23-25.

75. Harrison's declaration describes the parties' agreement as "in essence a commission from Ms. Chandler... to engage Mr. Maloy... to create a new version of the existing film with him as its producer." Harrison Decl. paragraph 8 (Dkt. #303 at 33-35; Exhibit E, pp.23-25).

76. Harrison further states that Defendant "had not received the contractually required payments under the Letter of Agreement, despite having completed and delivered the film." Harrison Decl. paragraph 16.

77. That statement directly contradicts Defendant's own sworn declaration in this case, which states the only version of the Film he ever distributed was a password-protected review copy "meant solely for review purposes." Dkt. #198 paragraph 18 (Exhibit E).

78. Harrison's declaration states he was "cc'd on the ensuing email chain" that included the parties' January 2023 agreement. Harrison Decl. paragraph 7.

79. On December 15, 2023 — nearly a year later — Defendant himself introduced a document to Harrison for the first time, writing: "And here is my contract with April." Exhibit B, p.27.

80. The document Defendant introduced was a Letter of Intent, which Defendant mischaracterized to Harrison as "the operative agreement." Exhibit B, p.29.

81. Harrison's declaration states that Plaintiff and Defendant jointly marketed "the completed film" to Netflix, Hulu, and Amazon, with Plaintiff creating the sales deck and Defendant the trailer. Harrison Decl. paragraph 12.

82. Defendant edited trailer footage at Plaintiff's direction for her own distributor outreach; Defendant has not identified any communication of his own with any distributor, while Plaintiff's own communications sharing distributor feedback directly with Defendant are already part of this record. Exhibit A, pp.28, 30.

83. Defendant's own December 15, 2023 letter, filed with this Court as his Exhibit 26, omits its actual final paragraph, in which Defendant wrote: "I contend that as a result of the above, I am the legal author and creator of the current version of the film," and demanded $75,000 in exchange for which he would "waive all rights" and return Plaintiff's MEDIA DRIVES. The complete letter, which Plaintiff received from Harrison the same day, is attached as Exhibit B, p.28. Chandler Decl. paragraph 24.

84. Defendant's own words confirm his ownership theory was never one of independent authorship: he ties his claimed authorship expressly and exclusively to the "fraudulent representations" he lists earlier in the same letter, not to any independent creative act. Exhibit B, p.28.

## M. NO GENUINE DISPUTE REMAINS THAT DEFENDANT INFRINGED PLAINTIFF'S COPYRIGHT

85. In denying Defendant's own motion for summary judgment on June 23, 2026, the Court found "at least a genuine dispute as to whether Defendant Maloy participated in uploading the Film to YouTube prior to its takedown," based on the record then before it. Dkt. #321 at 16.

86. The very next day, on June 24, 2026, Plaintiff served Defendant with discovery directed squarely at this question. Chandler Decl. paragraph 50.

87. On July 1, 2026, the Magistrate Judge ordered the parties to "meet and confer to work collaboratively to compromise on outstanding discovery disputes." Dkt. #323.

88. Notwithstanding that order, Defendant declined to admit or deny any of these requests, relying solely on a timeliness objection, and has to this day provided no answer, no witness, and no document addressing his coordination with Skipper. Exhibit I.

89. Skipper's own communication to Big Media states that he had been "in close contact with Michael Maloy who created the edit for Quest For Youth" and that they believed "we can finish this project at a higher level which will have more impact," adding that "Michael and myself believe it can end very positively for us all." Exhibit B, p.9.

90. That same submission included a link to the video Skipper described as "the trailer that my team had created" — the exact video Plaintiff subsequently identified and reported to YouTube, resulting in its takedown. Chandler Decl. paragraph 41; Exhibit D, p.21.

91. Skipper's own submission to Big Media states that he had been "in close contact with Michael Maloy who created the edit for Quest For Youth" and that they believed "we can finish

13

this project at a higher level which will have more impact," adding: "My apologies this isn't a positive message, but Michael and myself believe it can end very positively for us all." Exhibit B, p.9.

92. This Court's own order found that Defendant and Skipper "reached an agreement to proceed with their own version of Quest For Youth using [Plaintiff's] copyrighted footage and materials." Dkt. #321 at 16.

93. Plaintiff's discovery asked Defendant whether he communicated with Skipper about ownership, authorship, distribution, or Plaintiff before Skipper contacted Big Media, and whether Skipper communicated with Big Media about those same subjects. Exhibit H, RFA Nos. 18, 20.

94. Defendant refused to admit or deny either question, relying solely on a timeliness objection. Exhibit I.

95. This Court has already found that Defendant "is not asserting that he created a new film — independent of Plaintiff's Film — that lacks any substantial similarity to her Film," but only that his editing services "created something 'new' and 'independent' in its own right," an argument "foreclosed in light of Plaintiff's cited agreement." Dkt. #321 at 15.

96. This Court has already observed that Defendant proffered "no expert testimony nor any 'analytical dissection'" of the two works. Dkt. #321 at 16.

97. Exhibit F demonstrates that the version Defendant and Skipper agreed to pursue is not new or independent in any respect that matters: it shares an identical film poster, an identical cold open, the same cast interview footage, common B-roll, and an on-screen credit structure Defendant himself edited naming Plaintiff — not himself — as director. Exhibit F, pp.2-13.

**N. NO GENUINE DISPUTE EXISTS THAT DEFENDANT CONVERTED PLAINTIFF'S PROPERTY**

98. Defendant himself acknowledged Plaintiff's ownership of the drives in a contemporaneous message on August 21, 2023: "I can get your drives back to you." That statement — "your drives" — reflects Defendant's own understanding at the time that the drives belonged to Plaintiff, not him. Chandler Decl. paragraph 13; Exhibit A, pp.18-19.

99. The conversion timeline runs continuously and without interruption from Defendant's August 19, 2023 confirmation of receipt, through his December 15, 2023 termination letter (which did not return the drives), his January 14, 2024 competing copyright filing, and Plaintiff's January 17, 2024 cease-and-desist, to the present — nearly three years without return. Exhibit A; Exhibit B; Exhibit E; TAC paragraph 86.

100. This Court has already found that "Plaintiff has proffered evidence that she sent Defendant the physical drives... yet despite her repeated requests and formal cease and desist notice, Defendant has yet to return the footage." Dkt. #321 at 20.

101. Defendant's refusal to provide the first cut in an editable format is a separate additional act of conversion. TAC paragraph 130.

102. Defendant's conduct caused Plaintiff to lose the ability to commercially exploit the Film and delayed distribution opportunities, including under the Big Media distribution agreement. Chandler Decl. paragraph 37.

103. This Court has rejected preemption of Plaintiff's conversion claim twice. Dkt. #262 at 7-8; Dkt. #321 at 20.

**O. DEFENDANT CANNOT ESTABLISH THE ESSENTIAL ELEMENTS OF HIS COUNTERCLAIMS**

104. Defendant delivered a first cut only as a locked, non-editable review copy — never in editable format, and never a final cut — unilaterally terminated the engagement in December 2023 by his own letter seeking to "sever all ties," and to this day has never returned Plaintiff's MEDIA DRIVES, raw footage, or an editable first cut. Chandler Decl. paragraphs 15, 23, 35.

105. Defendant's December 15, 2023 letter — his own Exhibit 26 — did not assert co-ownership; he asked to be severed from Plaintiff's Film and removed from its promotional materials. Dkt. #303 at 49 (Exhibit E).

106. Defendant's last communication with Plaintiff was on November 10, 2023 — roughly a month after he delivered the first cut for review. Chandler Decl. paragraph 28.

107. Unaware that any unresolvable issue existed, Plaintiff continued to reach out to Defendant repeatedly over the following six weeks: on Thanksgiving, November 23; with good news about distribution, December 7; following up when she had not heard back, December 14; and on December 15, sharing information about Skipper's fabricated story, telling him directly to speak with her if he had any issue, and offering to connect him with long-term management for cast members who would have no knowledge of Skipper. Chandler Decl. paragraph 28; Exhibit A, pp.31-36.

108. Defendant ignored all of it, and his silence continued through a Merry Christmas message on December 25. Chandler Decl. paragraph 28; Exhibit A, pp.31-36.

109. Weeks later, in January 2024, Defendant contacted Bailey to ask about Plaintiff's ownership, received Bailey's direct confirmation that Plaintiff — not Skipper — owned the Film, and filed a competing copyright registration three days after that. Chandler Decl. paragraphs 32, 42.

110. As of January 8, 2024, Harrison had already relayed to Plaintiff that he had "Mike agreeing to what we want" — and Defendant had, through that same channel, already received the Quitclaim Agreement itself, documenting Plaintiff's ownership in writing. Exhibit A, p.42.

111. Despite already possessing that documentary confirmation, Defendant nonetheless went further and contacted Bailey directly, received Bailey's personal confirmation of the same fact, and only then filed a competing registration. Chandler Decl. paragraphs 32, 42.

112. Defendant proceeded with two independent, contemporaneous confirmations of Plaintiff's

16

ownership already in hand — and has, in the nearly three years since, never returned Plaintiff's MEDIA DRIVES, raw footage, or an editable version of the Film. Chandler Decl. paragraph 35.

113. On January 17, 2024, Plaintiff sent Harrison a contemporaneous email stating: 'This is why I wanted to go ex-parte to court last week and the ONLY reason I didn't is because you asked me to wait and now look what's happened. He didn't contact Frazer to confirm chain of title to decide to move the project along, but to steal it for himself.' Exhibit B, p.12.

114. Plaintiff had agreed, through Harrison, that the first money received from distribution would go to Defendant to cover his fees from First Cut to Final Cut. Exhibit A, p.42.

115. Rather than protect that arrangement, Defendant and Skipper instead contacted Big Media directly, asserting competing ownership claims that caused Big Media to pause and then pull the Film from distribution entirely — destroying the very deal that would have paid Defendant. Chandler Decl. paragraph 37.

116. Their own stated purpose was not to preserve Defendant's fee, but to pursue, in Skipper's own words, "an even better version of the film without Plaintiff." TAC paragraph 56.

117. Defendant's own sworn declaration filed in this case states that the only version of Quest for Youth he posted was "password protected and distributed to only Ms. Chandler and Tom Harrison," and that "it was meant solely for review purposes." Dkt. #198 paragraph 18 (Exhibit E) (emphasis added).

**P. DISCOVERY**

118. Each of Defendant's responses to Plaintiff's 24 Requests for Admission is identical: "Defendant declines to admit or deny this Request," relying solely on a timeliness objection. Chandler Decl. paragraph 54; Exhibit I.

119. Defendant never stated that he made a reasonable inquiry, and never stated that the information known or readily obtainable to him was insufficient to enable him to admit or deny, as to any of the 24 matters. Chandler Decl. paragraph 54; Exhibit I.

120. Defendant likewise declined to produce documents in response to any of the 16 Requests for Production, and declined to substantively answer any of the 21 Interrogatories, on the same stated ground. Chandler Decl. paragraph 54; Exhibit I.

121. Fact discovery is now closed, and Defendant has not sought relief from any of these responses. Chandler Decl. paragraphs 50-56; Exhibit I.


*Respectfully submitted,*


Dated: _____July 16, 2026_____


_____

April Chandler, Plaintiff Pro Se